USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT ____________________ No. 92-2265 UNITED STATES OF AMERICA, Appellee, v. MICHAEL McFADDEN, a/k/a MICHAEL HUGHES, Defendant, Appellant. ____________________ No. 92-2340 UNITED STATES OF AMERICA, Appellant, v. MICHAEL McFADDEN, a/k/a MICHAEL HUGHES, Defendant, Appellee. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Edward F. Harrington, U.S. District Judge] ___________________ ____________________ Before Breyer, Chief Judge, ___________ Aldrich, Senior Circuit Judge, ____________________ and McAuliffe,* District Judge. ______________ ____________________ ____________________ *Of the District of New Hampshire, sitting by designation. ____________________ Alan D. Rose with whom Marilee Denelle and Nutter, McClennen & _____________ _______________ ____________________ Fish were on brief for appellant. ____ Lon F. Povich, Assistant United States Attorney, with whom A. ______________ __ John Pappalardo, United States Attorney, was on brief for appellee. _______________ ____________________ January 18, 1994 ____________________ ALDRICH, Senior Circuit Judge. Defendant was ______________________ indicted in two counts: Count One, "On or about February 26, 1991, at Boston . . . defendant herein did knowingly and intentionally possess with intent to distribute . . . cocaine . . . in violation of Title 21, United States Code, Section 841(a)(1)." Count Two, "On or about February 26, 1991, at Boston . . . defendant herein did knowingly and intentionally use a firearm . . . during and in relation to the drug trafficking crime alleged in Count One of this Indictment . . . in violation of Title 18, United States Code, Section 924(c)." A jury found him guilty on both counts. The court sentenced him to 21 months on Count One, including points for possession of a firearm under Sentencing Guidelines.1 It ordered an acquittal on Count Two. From this the government appeals. Defendant appeals in other respects. The only error we find is the acquittal. We start there. Section 924(c) provides, "Whoever during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm" shall receive a mandatory sentence of five years, to be served on and after the sentence for the principal offense. The seriousness with which Congress viewed this conduct is emphasized by the fact ____________________ 1. U.S.S.G. 2D1.1(b)(1) calls for a two level enhancement, "[i]f a dangerous weapon (including a firearm) was possessed." This is an alternative to a conviction under 924(c). U.S.S.G. 2K2.4 (commentary). -3- that it denied parole at a time when parole was ordinarily available as a matter of course. If this may suggest apprehension of violence (see also 924(c)(2) and (3)), the ___ ____ Court has not so restricted the statute. Smith v. United _____ ______ States, 113 S.Ct. 2050 (1993) (gun bartered for drugs ______ constitutes "use" in relation to drug trafficking). Before discussing the statute further, we review the facts in the light, of course, most favorable to the government. United States v. McNatt, 813 F.2d 499, 502 (1st _____________ ______ Cir. 1987). Defendant, an 18 year old student, dealt in "twenties," $20 single packs of crack cocaine.2 On February 26, 1991, two undercover officers, armed with a warrant, rang the downstairs doorbell to his apartment, and asked for two twenties. Defendant brought down two from his room and the transaction, concededly, all took place in the foyer. As an officer sought thereafter to seize him, declaring his identity, defendant fled upstairs, locking his door. The officers broke down the door and conducted a search. This revealed their marked money under his mattress, together with an unloaded shotgun. Under the bed, in a container, were more money and packs. Was this use of the gun "in relation to the crime"? ____________________ 2. At sentencing it appeared that the government had weighed seven of eighteen packs and that they totalled .83 gram. -4- That the gun was unloaded, and no ammunition found, could be evidence in defendant'sfavor, but unloaded guns can be used aggressively. McLaughlin v. United States, 476 U.S. __________ _____________ 16, 17-18 (1986) (unloaded gun is "dangerous weapon" for purposes of 18 U.S.C. 2113(d)). Nor would use be rebutted by lack of ownership. See United States v. Wight, 968 F.2d ___ _____________ _____ 1393 (1st Cir. 1992). The jury, further, could reject defendant's claim that the gun belonged to his sister's former boyfriend, and that he was merely hiding it from his nephews. While mere possession is not a crime, the government properly asked the jury, why did he keep it? We agree with defendant that the word "uses" calls for something more than "possesses." We may further agree that in defendant's transaction with the officers he did not use the gun, and had no intent to. The difficulty is that the drug trafficking crime, as defined in 21 U.S.C. 841(a)(1), with which he was charged was possession with intent, not the sale. We have held that mere presence of arms for the protection of drugs for sale is present use. United States v. Wilkinson, 926 F.2d 22 (1st Cir.) (guns in _____________ _________ duffel bag with cocaine), cert. denied, 111 S. Ct. 2813 _____________ (1991); United States v. Hadfield, 918 F.2d 987 (1st Cir. ______________ ________ 1990) (guns on the drug premises), cert. denied, 111 S. Ct. ____________ 2062 (1991). Wilkinson's taking guns with the drugs to someone else's house would seem active use. And it is true -5- that defendant Hadfield publicly advertised that he had guns, clearly a present use as a deterrent. However, we based our opinion broadly, on simple presence for protection, the maintenance of a "fortress." It could be said that mere maintenance of a secret fortress is not a present use, but is an intent regarding possible future use. However, we did not, and the majority of the circuits do not, draw that distinction. See United ___ ______ States v. Wesley, 990 F.2d 360, 365 (8th Cir. 1993) ______ ______ ("presence and ready availability of a firearm at a house where drugs are dealt" is sufficient); United States v. ______________ Young-Bey, 893 F.2d 178, 181 (8th Cir. 1990) (presence and _________ availability crucial), cited with approval in Hadfield and ________ Wilkinson; United States v. Hager, 969 F.2d 883, 889 (10th _________ ______________ _____ Cir.) (following Hadfield), cert. denied, 113 S.Ct. 437 ________ ____________ (1992); United States v. Torres-Medina, 935 F.2d 1047, 1049- _____________ _____________ 50 (9th Cir. 1991) (availability sufficient); United States _____________ v. Boyd, 885 F.2d 246, 250 (5th Cir. 1989) ("It is enough ____ that the firearm was present at the drug-trafficking scene, that the weapon could have been used to protect or facilitate the operation, and that the presence of the weapon was in some way connected with the drug trafficking"), cited with approval in Hadfield and Wilkinson; United States v. Acosta- ________ _________ _____________ _______ Cazares, 878 F.2d 945, 952 (6th Cir.) ("We hold that 'uses' _______ and 'carries' should be construed broadly to cover the gamut -6- of situations where drug traffickers have ready access to weapons with which they secure or enforce their transactions"), cited with approval in Hadfield, cert. ________ _____ denied, 493 U.S. 899 (1989). But see United States v. ______ ___ ___ _____________ Robinson, 997 F.2d 884 (D.C. Cir. 1993); United States v. ________ _____________ Derr, 990 F.2d 1330 (D.C. Cir. 1993). ____ There is, of course, a difference between a large quantity of cocaine with a "fortress" of guns, and a $20 dealer with two grams of cocaine and an unloaded shotgun, but it is a difference in degree, not in kind. It can not be for the court to control the U.S. Attorney's use of this truly fortress of a statute; a defendant's only hope is the U.S. Attorney's judgment, and the jury. Here he failed. Alternatively, defendant seeks a new trial. We have examined his several contentions with care, but they require little comment. Defendant's complaints as to the charge, and to the weight of the evidence, are in accord with his claims on the acquittal, and must fail equally. The court's adjustments and failure to adjust the sentence on Count One were, routinely, within its discretion. A word as to the dissent. We share in approving the flexibility of the Sentencing Guidelines, but we see no give, and no surrender, in this monolith of a statute, on the books for many years and not disturbed when the Guidelines were enacted. Moreover, how does one measure for this? And -7- in what way do our differing facts, on a case by case basis, indicate that we are taking a new approach? Only one gun? Possible lack of title? No ammunition?3 Lack of exhibiting? No instant access? Under our cases none of these failures is fatal. The reason for this is that the difference between mere possession and use is in the mind of the user. United States v. Payero, 888 F.2d 928, 929 (1st _____________ ______ Cir. 1989) (possession lending courage is use); Wilkinson, _________ 926 F.2d at 25 ("emboldening," quoting United States v. ______________ Stewart, 779 F.2d 538, 540 (9th Cir. 1985)); United States v. _______ _____________ Castro-Lara, 970 F.2d 976, 983 (1st Cir. 1991), cert. denied ___________ ____________ sub nom Sarraff v. United States, 113 S. Ct. 2935 (1993) ________ _______ ______________ (possession with "intent to have it available for possible use"); Wilkinson at 26 ("intended the guns for protection"). _________ Was the stash too small to make intent more than a theoretical possibility? Even without defendant's admission, "It's good protection for anyone in the neighborhood to have a gun in their house also because people get robbed," we cannot think that $360 in drugs plus $510 in cash, would not warrant a jury's finding that defendant's thinking included ____________________ 3. While other circuits have held that lack of ammunition does not prevent conviction in a "drug trafficking crime," e.g., United States v. Martinez, 912 F.2d 419, 421 (10th Cir. ____ _____________ ________ 1990), cited with approval in United States v. Castro-Lara, _____________ ___________ post, 970 F.2d at 983, we have held this only in a "crime of ____ violence" case. United States v. Kirvan, 997 F.2d 963, 966 _____________ ______ (1st Cir. 1993) (gun need not be "loaded or operable"). We see no distinction. -8- the gun. The statute does not measure the crime. In light of the accounts we read daily of mayhem over trifles, we adopt what we said in Wilkinson, (and remembering what _________ Wilkinson itself said was "help"), "[U]ltimately, whether or _________ not the gun[ ] helped appellant commit the drug crime is a matter for a jury, applying common-sense theories of human nature and causation." 926 F.2d at 26. This is not to say that it need "automatically" find it. Nor is it to say that we like the inflexibility of this statute, or the judgment of the United States Attorney in invoking it for such a minor defendant. The case is remanded to the district court to ___________________________________________________ vacate the acquittal; reinstate the verdict of guilty on _____________________________________________________________ Count Two; to sentence on Count Two, and to readjust the _____________________________________________________________ sentence on Count One appropriately. ___________________________________ (Dissent follows.) -9- BREYER, Chief Judge (dissenting). The narrow ____________ legal question before this panel is not whether possession _______ of a gun ("in relation to the [drug] crime") means a longer sentence for a convicted drug dealer. It most certainly does. Nor is the question whether the "possession" here was "in relation to" the drug crime, ante at 4. It was. _______________ ____ Rather, the question concerns which sentencing statute __________________________ governs the precise length of the extra term of punishment, a blunt "mandatory minimum" gun "use" statute, 18 U.S.C. 924(c) (mandatory five-year sentence), or the somewhat more sophisticated sentencing guideline statutes, under which extra punishment for drug-related gun possession varies with the seriousness of the drug crime. U.S.S.G. 2D1.1(b)(1) (2-level sentence enhancement). The answer to this question turns on the meaning of a single word in the "mandatory minimum" statute, the word "use." Does that word "use" include simple "possession" of a gun "connected ___ with" a drug crime? If so, the majority is right, for I have no doubt that the jury here could find both a "possession" and some kind of "relation" or "connection" between gun and crime. But, in my view, prior cases, and likely congressional intent, indicate that the word "use," in this particular statute, carries a more active meaning -- ameaning thatexcludes simple(drug-crime-related) possession. -10- Let me be more specific. The special "mandatory minimum" sentencing statute says that anyone who "uses or _______ carries" a gun "during and in relation to any . . . drug _______ trafficking crime" must receive a mandatory five-year prison term added on to his drug crime sentence. 18 U.S.C. 924(c). At the same time, the Sentencing Guidelines, promulgated under the authority of a different statute, 28 U.S.C. 994, provide for a two-level (i.e., a 30% to 40%) sentence enhancement where a "firearm . . . was possessed" by a drug offender, U.S.S.G. 2D1.1(b)(1), unless the possession clearly was not "connected with the [drug] offense." Id. app. n.3. The Guideline enhancement for ___ drug-crime-related gun possession may amount to less than five additional years, as it would here. The specific question before us is whether, for sentencing purposes, courts should try to distinguish between a gun's drug-crime- related "use" and its drug-crime-related "possession," particularly when the predicate drug crime is "possession with intent to distribute." Courts might have simplified the matter by answering this question in the negative. They might have reasoned that, at least in drug possession cases, virtually __________ any possession of a gun amounts to "use" within the meaning -11- 11 of 924(c). Arguably, any gun that is both possessed by a ___ drug offender, and present at or near the site of a drug possession crime, helps the offender carry out the drug crime. It might do this by "emboldening" him, or perhaps by being available, should the need arise, to frighten others or to protect the drugs possessed. Cf. United States v. ___ ______________ Stewart, 779 F.2d 538, 540 (9th Cir. 1985). Until today, _______ however, courts have not taken this approach. On the ___ contrary, they have insisted on maintaining a significant distinction between "possession" and "use" of a gun by drug offenders in the context of prosecutions under 924(c). United States v. Castro-Lara, 970 F.2d 976, 983 (1st Cir. _____________ ___________ 1992), cert. denied, 113 S. Ct. 2935 (1993); United States ____________ _____________ v. Payero, 888 F.2d 928, 929 (1st Cir. 1989); United States ______ _____________ v. Robinson, 997 F.2d 884, 887 (D.C. Cir. 1993) (statute ________ "conspicuously fails to criminalize mere possession"). Traditional tools of statutory interpretation support the near-universal judicial effort to maintain the distinction between (drug-related) "use" and "possession." First, the ordinary meanings of the words "use" and "carry" -- the language in the "mandatory minimum" statute - - connote activity beyond simple possession. Cf. Smith v. ___ _____ United States, 113 S. Ct. 2050, 2054 (1993) (the term "use" _____________ -12- 12 is to be given its "ordinary or natural meaning" in construing 924(c)). Second, Congress wrote those words in the context of gun crime statutes that often use the broader word "possess" to describe the prohibited gun-related conduct. See, e.g., 18 U.S.C. 922(g), (q)(1)(A). As the ___ ____ somewhat hackneyed judicial aphorism goes, when Congress wants to criminalize gun possession, it knows how to do so. Third, a House Report accompanying the 1986 amendment to 924(c) (which extended the statute to drug crimes) provides some indication of Congress's expectation about the meaning of the word "use." In the course of discussing the "carrying" part of the statute, the Report offers the example of a drug trafficker who "carrie[s]" a weapon "for protection against rival traffickers." Such a person quite clearly "possesses" the weapon with the intent to make active use of it if necessary; yet, the Report adds, "he did not actually use the weapon." H.R. Rep. No. 495, 99th ___ Cong., 2d Sess. 10 (1986), reprinted in 1986 U.S.C.C.A.N. ____________ 1327, 1336. Most importantly, courts normally try to read language in different, but related, statutes, so as best to reconcile those statutes, in light of their purposes and of common sense. In this instance, one relevant statute, the -13- 13 statute creating the Sentencing Guidelines, reflects a major congressional effort to create a fairly sophisticated Sentencing Guidelines system that distinguishes among different kinds of criminal behavior and punishes accordingly. The other statute, the mandatory minimum statute, represents an ad hoc deviation from that more general policy. Given the importance (to Congress) of the Guidelines system, see Mistretta v. United States, 488 U.S. ___ _________ _____________ 361, 363-370 (1989), courts should take care not to interpret other statutes that represent ad hoc deviations from the basic congressionally-directed effort to rationalize sentencing with unnecessary breadth. Yet, here, ___________ to interpret the word "use" to encompass "possession" is to swallow up a guideline that distinguishes, for punishment purposes, among different kinds of drug- and gun-related criminal behavior. Moreover, it is to swallow up the guideline unnecessarily, for neither the language of the _____________ mandatory minimum statute nor its purpose (the need to punish drug offenders with guns) requires that it do so. I confess that it is easier to see the need to distinguish (drug-crime-related) "use" from "possession" than it is to explain just how to make the distinction. Courts might have interpreted "use" by insisting upon -14- 14 activity with the gun, such as firing it or brandishing it, ________ or, at least, displaying it (or even trading it for drugs, see Smith, supra). But they have not done this. Rather, ___ _____ _____ they have held that the word "use" sometimes encompasses more passive activity, such as "possession," but sometimes it does not. Thus, we must try to articulate the distinguishing line they have drawn. As I read the case law, when courts have held that "use" encompasses "possession," they have always found (1) possession, (2) in connection with a drug crime, and (3) something more. See United States v. Wilson, 884 F.2d 174, ______________ ___ ______________ ______ 177 (5th Cir. 1989) (except in "drug fortress" cases involving large amounts of drugs and money, "something more than strategic proximity of drugs and firearms is necessary to honor Congress' concerns."). And, they have tended to describe this "something more" as possession of the guns for ___ protection of the drugs, thereby "facilitat[ing]" the drug __________ crime. See, e.g., United States v. Wilkinson, 926 F.2d 22, ___ ____ ______________ _________ 26 (1st Cir.) (conviction sustained where circumstances allowed jury to find that defendant "intended the guns for protection"), cert. denied, 111 S. Ct. 2813 (1991); United ____________ ______ States v. Hadfield, 918 F.2d 987, 998 (1st Cir. 1990) ______ ________ (conviction sustained "so long as one purpose in situating -15- 15 the weapon nearby was to protect the narcotics enterprise"), cert. denied, 111 S. Ct. 2062 (1991); United States v. _____________ _____________ Payero, 888 F.2d 928, 929 (1st Cir. 1989) (conviction ______ possible where firearm gave defendant courage by allowing him to protect himself); United States v. Bruce, 939 F.2d ______________ _____ 1053, 1055 (D.C. Cir. 1991) (guns may be "used" in relation to a possession crime "because they are intended to protect the stash of drugs that will subsequently be distributed"); ante at 5 ("mere presence of arms for the protection of ____ ______________________ drugs for sale is present use") (emphasis added). ______________ Of course, language such as "possession for protection" would not help the problem very much if that language itself were broadly interpreted or applied. If, for example, courts simply said that possession of a gun when drugs are around means a fortiori that the gun is ___________ present "for protection" of the drugs, the mandatory minimum statute's word "use" would (once again) swallow up the Guideline and eradicate the distinction between "use" and "possession" that courts have tried to maintain. It is therefore not surprising that the courts have not ___ interpreted or applied this language broadly. They have avoided the "swallowing up" result by applying the "possession for protection" concept only where circumstances -16- 16 demonstrate that a drug offender, possessing a gun (in connection with the crime), would likely put the gun to _____________ active use (such as firing or brandishing it, or at least displaying it in an effort to intimidate) were the need to _________________ arise. In determining whether this later, active use is _____ likely (i.e., in separating a theoretical possibility from a real risk), courts have looked at such factors as the gun's accessibility, whether it is loaded, the amount of drugs possessed, the presence of other guns, and the extent to which dangerous transactions likely take place nearby, as a way of deciding whether the "circumstances of the case show" that the gun was present for protection. United States v. _____________ Plummer, 964 F.2d 1251, 1254 (1st Cir.), cert. denied, 113 _______ ____________ S. Ct. 350 (1992); see, e.g., Robinson, 997 F.2d at 887 ___ ____ ________ (listing factors); United States v. Derr, 990 F.2d 1330, _____________ ____ 1338 (D.C. Cir. 1993). Examined in light of the case law's possession/use distinction, the record before us indicates that this drug offender's "possession" of the gun, even if related to the drug crime, does not rise to the level of a "use." The defendant here was a small-time drug dealer, selling drugs in $20 packages. The police found a shotgun, unloaded, wrapped in a cloth bag, hidden between his bed's mattress -17- 17 and its box spring (but next to $40 the police had paid him, and above a strongbox on the floor containing two grams of cocaine and $510 cash). They found no ammunition anywhere in the apartment. The defendant testified, without contradiction and consistently with an earlier government affidavit, that the gun belonged to someone else. The gun was not visible, so its mere presence could not automatically have frightened a buyer or intruder. The defendant did not brandish, display, touch, or mention the gun during the transaction with police, nor was there any evidence that he had ever done so during the time he possessed drugs. To make active use of the gun in protecting his drugs or intimidating a buyer or intruder, he would have had to lift the mattress, seize the gun, and unwrap it. To fire the gun, the defendant would have had to find ammunition, bring it to the apartment, and load the gun. The small amount of cocaine possessed makes it somewhat less likely that, in fact, he had (or would have) done either. In context, the defendant's "admission," ante ____ at 8, does not seem particularly relevant. Of course, one cannot exclude the possibility that any gun that is present, the way this gun was present, might be put to active "use." But that is so virtually whenever a -18- 18 gun is present near the scene of a drug crime. To find a "possession for protection" (i.e., a "use") here is, in effect, to find that possession of a gun (when related to a drug crime) automatically means a "use." It thereby erases _____________ the line that the statutes, and the courts, have tried to draw, and again allows the "use" statute to swallow up the "possession" Guideline. A brief review of these cases indicates rather strong support for the distinction I am drawing. Consider cases in which courts have permitted a jury to infer that a defendant "used" nearby guns to "protect" a stash of drugs. They involve drug-related risks of actually firing or brandishing (or "carry[ing]") the gun that are significantly greater than the risks present here. In this circuit's Hadfield case, for example, the inference -- that the ________ defendant "used" the guns to "protect" the drugs -- was neither uncertain nor theoretical: it was inescapable. The defendants ran a massive drug operation from a barn that contained hundred of marijuana plants, thousands of dollars in cash, and several guns, at least two of which were loaded, standing on a nearby gun rack or hanging on the barn walls. A sign near the barn said, "This house guarded by shotgun three nights per week. You guess which three." 918 -19- 19 F.2d at 991. A clearer case of using guns for protection is hard to imagine. Our Wilkinson case, although closer, presented a _________ somewhat different legal question. There, the defendant "carr[ied]" with him to a friend's house a duffel bag that contained two loaded guns (wrapped in a towel) and a cache of drugs (although the Wilkinson opinion is silent on the _________ point, the record indicates that the guns were loaded). The proximity of loaded guns to the drugs and the fact that the defendant was carrying them together from place to place permitted the jury to infer that the defendant "intended the guns for protection," and thus that he carried them "in relation to" his drug crime. Id. at 25-26. (Since ___ Wilkinson involved the statutory terms "carry" and "in _________ relation to," strictly speaking it did not raise the "use/possession" problem here discussed.) Similarly, other cases allowing an inference of presence "for protection" have involved close proximity and loaded guns, or large drug operations, or multiple weapons, ______ _____ ________ or easy accessibility, or some factor suggesting more than a ____ ____ theoretical possibility that the guns might be used to protect the drugs if necessary. See, e.g., Castro-Lara, 970 ___ ____ ___________ F.2d at 983 (gun was "near a large sum of cash, in close -20- 20 proximity to live ammunition" while defendant was "taking delivery of a sizable quantity of cocaine"); Plummer, 964 _______ F.2d at 1254 (gun in defendant's car with ammunition in easy reach of driver; evidence that defendant "had moved" the gun); United States v. Abreu, 952 F.2d 1458, 1466 (1st Cir.) _____________ _____ (five weapons in apartment with "significant amount" of drugs; testimony and palmprint connected the guns to defendants' drug operation), cert. denied, 112 S. Ct. 1695 ____________ (1992); see also United States v. Wesley, 990 F.2d 360 (8th ________ _____________ ______ Cir. 1993) (fully loaded gun found on floor within reach of sleeping defendant); United States v. Hager, 969 F.2d 883 _____________ _____ (10th Cir.) (three guns, at least one loaded, found near 2.8 kilograms of cocaine in apartment), cert. denied, 113 S. Ct. ____________ 437 (1992); United States v. Torres-Medina, 935 F.2d 1047 _____________ _____________ (9th Cir. 1991) (loaded gun found next to cocaine); United ______ States v. Boyd, 885 F.2d 246 (5th Cir. 1989) (loaded shotgun ______ ____ in arm's reach of defendant near methamphetamine manufacturing operation; agent testified that defendant had taken shotgun from car with drug paraphernalia and took it with him during a subsequent journey); United States v. _____________ Acosta-Cazares, 878 F.2d 945 (6th Cir.) ("numerous loaded ______________ weapons," thousands of dollars in cash, and two kilograms of cocaine found in two apartments used by coconspirators; -21- 21 coconspirator testified that defendant carried weapons while engaging in drug transactions), cert. denied, 493 U.S. 899 ____________ (1989); United States v. Anderson, 881 F.2d 1128 (D.C. Cir. _____________ ________ 1989) (crack house contained several loaded weapons, large quantities of crack cocaine, cocaine powder, and cash; expert testimony indicated that weapons frequently protect "crack houses"); United States v. Matra, 841 F.2d 837 (8th _____________ _____ Cir. 1988) (fortress contained numerous loaded weapons, ammunition, thousands of dollars of cash, and hundreds of thousands of dollars worth of cocaine). Consider, by way of contrast, cases in which courts have refused to permit the jury to infer that the defendant "used" nearby guns to protect a stash of drugs. Many seem to involve risks of firing or brandishing (or displaying) a gun at least as great as those present here; in some, the risk seems greater. In United States v. _____________ Robinson, the D.C. Circuit refused to permit a "used for ________ protection" inference where a defendant kept an unloaded pistol and drugs in a locked footlocker in a closet (the footlocker, in contrast with Wilkinson, apparently was not _________ "carried" from place to place). 997 F.2d 884, 887-88 (D.C. Cir. 1993). In United States v. Sullivan, 919 F.2d 1403 _____________ ________ (10th Cir. 1990), even though defendant kept an unregistered -22- 22 gun in her home where she also maintained a drug laboratory (and was convicted for possession of an unregistered firearm), the court refused to permit the "protection" inference because no additional evidence supported an intent to use the weapon in that way with respect to the drug operation. Id. at 1432 & n.45. In United States v. Derr, ___ ______________ ____ 990 F.2d 1330 (D.C. Cir. 1993), the court would not permit the inference where the defendant kept an unloaded pistol and his drug supply in a locked closet. See also, e.g., ________ ____ United States v. Matthews, 942 F.2d 779, 783-84 (10th Cir. _____________ ________ 1991) (reversing 924(c) conviction where, despite presence of weapons in plain view in an apartment containing drugs, evidence did not suggest that defendant "intended to avail himself of the firearms"); United States v. Bruce, 939 F.2d _____________ _____ 1053, 1055-56 (D.C. Cir. 1991) (reversing 924(c) conviction because presence of loaded gun in one pocket and drugs in other pockets of defendant's raincoat indicated intent to use the gun in connection with future distribution, not protection of present possession). The theoretical possibility of active use was always present in these cases, but the courts considered it too remote to allow a jury to find, beyond a reasonable doubt, that the gun was present "for protection." -23- 23 Of course, one might simply argue that these cases are not all consistent with each other. However, whether or not that is so seems to me beside the point. The division in the case law indicates a perceived need to draw a legal line between simple possession of a gun and its use. In order to draw that line, one must say that at some point, the risk that a defendant will actually fire or brandish or display a nearby gun "to protect" a drug stash becomes too small to permit the jury to infer an intent to protect. Our previous cases lie on one side of that line. If we are to maintain the legal distinction that courts have tried to draw (and if we are to avoid collapsing the "possession" Guideline into the mandatory five-year term of the "use" statute), this case, as the district court held, must lie on the other. For these reasons, I would affirm the decision of the district court. -24- 24